UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

BRAND ENGAGEMENT NETWORK, INC.

        Plaintiff,

    -against-                                                                                25-cv-2245 (CM)

AFG COMPANIES, INC.,

        Defendant.

---------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/9/26

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART COUNTERCLAIM-DEFENDANTS' MOTIONS TO DISMISS COUNTERCLAIM-PLAINTIFF'S COUNTERCLAIMS

McMahon, J.:

Defendant Automotive Financial Group Companies, Inc. ("AFG") asserts various Counterclaims against Plaintiff Brand Engagement Network, Inc. ("BEN") and Individual Counterclaim-Defendants Michael Todd Lucas ("Lucas"), Patrick Nunally ("Nunally"), Paul Chang ("Chang"), and Christopher Gaertner ("Gaertner") (together, the "Counterclaim-Defendants"). In BEN's complaint, AFG is accused of breaching its contractual obligations under the parties' Subscription Agreement by failing to make the first required installment payment of $6.5 million in exchange for its purchase of shares in BEN. In its counterclaims, AFG alleges that it was fraudulently induced to enter into the Subscription Agreement in reliance on Counterclaim-Defendants' false and misleading statements concerning BEN's technology, partnerships, and intellectual property assets. In the alternative, AFG brings claims against BEN for rescission of the Subscription Agreement on grounds of mutual and unilateral mistake.

Before the Court are Counterclaim-Defendants' motions to dismiss AFG's counterclaims. *See* Dkt. Nos. 39, 42. For the reasons set forth below, Counterclaim-Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Unless otherwise indicated, the Court draws all facts from AFG's Answer and Counterclaims and the documents incorporated by reference therein.[1] *See Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000). The court accepts as true the facts alleged in AFG's counterclaims and draws all reasonable inferences in AFG's favor. *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). The Court is not required, however, to accept as true "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I.    Parties

Defendant and Counterclaim-Plaintiff Automotive Financial Group Companies, Inc. ("AFG") operates in the automotive industry, catering to auto dealers' finance and insurance needs. Among other things, AFG offers services that assist auto dealers in administering their finance and insurance products. AFG was founded and is led by Ralph Wright Brewer III ("Brewer").

Plaintiff and Counterclaim-Defendant Brand Engagement Network Inc. ("BEN"), also known as "PubCo," is a publicly traded, NASDAQ-listed Delaware Corporation. BEN is "an innovator in AI-powered customer engagement solutions, providing advanced technology designed to enhance data utilization, improve customer interactions, and drive operational efficiency." Dkt. No. 7 at ¶ 1. BEN is the successor in interest to a prior corporation, also known

---

[1] This includes BEN's First Amended Complaint, Dkt. No. 7, the September 7, 2023 Subscription Agreement, Dkt. No. 1-1; the September 29, 2023 Amendment to the Subscription Agreement, Dkt. No. 54-1; and the Investor Presentation, Dkt. No. 43-2.

as Brand Engagement Network Inc. (Prior BEN), which was incorporated in Wyoming. [2] Prior BEN was a private entity; it was not publicly traded.

Counterclaim-Defendant Michael T. Lucas ("Lucas") is Prior BEN's co-founder and *de facto* chief executive officer. Lucas and his spouse are BEN's largest shareholders. Lucas was the principal negotiator for Prior BEN in discussions with AFG concerning the Subscription Agreement.

Counterclaim-Defendant Patrick Nunally ("Nunally") was a co-founder of Prior BEN and is BEN's chief scientist and co-chief technology officer.

Counterclaim-Defendant Paul Chang ("Chang") is BEN's current chief executive officer and serves on BEN's Board of Directors. At the time of the negotiations at issue, Chang was Global President of Prior BEN.

Counterclaim-Defendant Christopher Gaertner[3] ("Gaertner") was chief executive officer and chief financial officer of DHC Acquisition Corp. ("DHC"), a publicly traded special purpose acquisition company ("SPAC") formed for the purpose of merging with a private company and taking it public. At all relevant times, Gaertner has been a director of DHC or BEN.

## II.    Facts

In the spring of 2023, Lucas, Prior BEN's co-founder, began negotiations with Brewer, AFG's founder, to enter into a financial and commercial relationship. Lucas, Nunally, Chang, and others pitched Prior BEN to Brewer as having developed "avatars" – human-like conversational

---

[2] Prior BEN is not a party to this lawsuit. Unfortunately, unless otherwise indicated, AFG refers to "BEN" in its counterclaims without distinction between Prior (pre-merger) BEN and Current (post-merger) BEN.

[3] Defendant Gaertner initially moved for dismissal under Federal Rule of Civil Procedure 12(b)(1) on grounds that the Court could not exercise supplemental jurisdiction over AFG's Counterclaims against him without defeating diversity jurisdiction. Counterclaim-Defendants later withdrew the Rule 12(b)(1) motion, conceding that this Court has subject-matter jurisdiction over Gaertner. Dkt. No. 53 at 14 n.6. In any case, the Court is satisfied that it has subject-matter jurisdiction over AFG's Counterclaims against Gaertner. *See ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, 2021 WL 1177532, at *13–15 (S.D.N.Y. Mar. 29, 2021).

artificial intelligence programs – which could interact with car dealers' human employees and customers and assist them with various tasks. AFG believed that "such lifelike software, if it could draw its responses from the data in AFG's and AFG's customers' existing databases and systems, would be attractive to dealers" and that the opportunity to market BEN's software would be beneficial to both parties. Counterclaim ¶ 13.

On September 7, 2023, Prior BEN entered into a Subscription Agreement with AFG. Pursuant to the Subscription Agreement, AFG agreed to purchase 650,000 Initial Shares of BEN's common stock at an aggregate purchase price of $6.5 million. In addition to the Initial Shares, AFG agreed to purchase four tranches of stock, for a total purchase price of $32.5 million. These additional tranches would be purchased in four annual installments of $6.5 million.

In addition to the Subscription Agreement, Prior BEN and AFG entered into a Reseller Agreement (the "Reseller Agreement"), pursuant to which AFG agreed to become the exclusive reseller of Prior BEN's technology to the automotive industry. In exchange, AFG agreed to pay a licensing fee of 50% of all amounts collected from AFG's customers' use of Prior BEN's technology. AFG would also receive a grant of shares of BEN at the time of the Merger and a warrant that would entitle AFG to buy tranches of BEN shares at a $10 strike price to the extent that defined revenue thresholds were met in the future.

On the same day the Subscription Agreement was executed, Prior BEN entered into a Merger Agreement with DHC. Pursuant to the Merger Agreement, Prior BEN would become a wholly-owned subsidiary of DHC, and DHC would be renamed "Brand Engagement Network Inc." ("BEN"). At the time of the Merger closing, shareholders of Prior BEN would become shareholders in BEN, and BEN would succeed to the obligations of Prior BEN.

Both the Subscription Agreement and Reseller Agreement were conditioned on Prior BEN's finalizing a deal with DHC to go public via the Merger. AFG's intent, as discussed among the parties, was to fund future equity investments in BEN with the revenues it realized from the sale of Prior BEN's technology. AFG did not want to invest in BEN unless it could play a role in selling BEN's technology – which it believed could readily be commercialized – and "did not want to sell BEN's technology unless it stood to receive upside via an equity investment" in BEN following the Merger. Counterclaim ¶ 24.

AFG's first $6.5 million investment under the Subscription Agreement was due to be made at the time of the Merger closing. After the Subscription Agreement was executed, however, Prior BEN and DHC discovered that Prior BEN "had a cash hole that needed to be filled even before the merger closed." Counterclaim ¶ 71. Prior BEN and DHC therefore convinced AFG to enter into a letter agreement amending the Subscription Agreement (the "Amendment"). Pursuant to the Amendment, AFG agreed to make an immediate payment of $1 million (to be applied against the $6.5 million purchase contemplated in the Subscription Agreement) in exchange for the immediate issuance of a block of shares in Prior BEN at an approximately 20% discount relative to the price contemplated in the Subscription Agreement. At Merger closing, this block of shares would convert into shares of BEN. Because this $1 million was to be applied against the $6.5 million that AFG agreed to invest in at the time of and conditional on the Merger closing, the Amendment meant that AFG would invest $5.5 million to obtain BEN shares at the time of closing.

The Amendment was executed on September 29, 2023, and AFG made the required $1 million payment pursuant to the terms of the Amendment. AFG purchased the remaining $5.5 million of BEN shares when the Merger closed in March of 2014. AFG has not purchased any of the subsequent four tranches of shares contemplated under the Subscription Agreement. One day

before AFG's first annual installment payment was due, BEN issued a defective notice to AFG requesting $6.5 million. Shortly thereafter, AFG terminated the Subscription Agreement.

## III.    The Instant Lawsuit

BEN initiated this breach of contract action against AFG on March 18, 2025. Dkt. No. 1. On March 26, 2025, BEN filed its First Amended Complaint, alleging that AFG breached the Subscription Agreement by failing to make the first installment payment as required, despite all conditions precedent to the requirement for payment having been either satisfied or waived. Dkt. No. 7.

AFG filed its Answer and Counterclaims on May 12, 2025, denying liability for breach of contract and contending that BEN had materially breached the parties' agreements by, among other things, failing to deliver the promised technology. Dkt. No. 17. AFG also asserted five counterclaims against Counterclaim-Defendants: fraud and fraudulent inducement (Count 1), mistake (Count 2), primary liability under the Texas Securities Act (Count 3), control person liability under the Texas Securities Act (Count 4), and aider and abettor liability under the Texas Securities Act (Count 5). AFG alleges that, shortly following the Merger, BEN's stock price collapsed, rendering AFG's $6.5 million investment in BEN shares essentially worthless. The decline in BEN's stock price, AFG contends, was a direct result of the market realizing what Counterclaim-Defendants concealed from AFG: that BEN had no viable technology, no valuable partnerships, and little or nothing in the way of intellectual property assets.

Counterclaim-Defendants move to dismiss each Count.

6

## LEGAL STANDARD

### I.    Motion to Dismiss Pursuant to Rule 12(b)(6)

The rules for dismissal of a counterclaim are no different than those applicable to dismissal of a complaint: To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

### II.    Pleading Fraud Pursuant to Rule 9(b)

When a cause of action sounds in fraud, a plaintiff must satisfy the heightened pleading standard of Rule 9(b). *See* Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Although Rule 9(b) provides that "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. *Kalnit v. Eichler*, 264 F.3d 131, 137–38 (2d Cir. 2001). A

7

"strong inference" of scienter can be established through factual allegations showing "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 206 (S.D.N.Y. 2004).

**DISCUSSION**

## I.    COUNT 1: FRAUD AND FRAUDULENT INDUCEMENT[4]

AFG alleges that Counterclaim-Defendants fraudulently induced AFG to enter into and perform under the Subscription Agreement and Amendment by making false and misleading representations about BEN's capabilities, technology, partnerships, valuation, intellectual property, and the credentials of its chief scientist.

The alleged misrepresentations at issue include representations made prior to the execution of the Subscription Agreement, representations made after the Subscription Agreement's execution but prior to the Amendment, and representations made in a post-Amendment Registration Statement. Of the alleged misrepresentations made prior to the Subscription Agreement's execution, three were made in an Investor Presentation, which is expressly listed in the Subscription Agreement as one of the Disclosure Documents on which AFG was entitled to rely. The remaining pre-Agreement representations fall outside the scope of the Disclosure Documents, which AFG does not contest.

The Subscription Agreement includes a choice of law clause, indicating that any action arising out of or in connection with the Agreement will be governed by New York law. To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff

---

[4] Because AFG does not distinguish between its fraud and fraudulent inducement counterclaims, the Court considers them together.

reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995). Similarly, a claim for fraudulent inducement requires a plaintiff to prove: (1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury." *CANBE Props., LLC v. Curatola*, 227 A.D.3d 654, 656 (2024).

### a. ALLEGED MISREPRESENTATIONS MADE PRIOR TO THE EXECUTION OF THE SUBSCRIPTION AGREEMENT AND NOT CONTAINED IN THE INVESTOR PRESENTATION

AFG alleges that it entered into the Subscription Agreement based on misrepresentations about BEN's capabilities, technology, partnerships, valuation, intellectual property, and the credentials of Nunally, its chief scientist.

Counterclaim-Defendants argue that AFG's fraud claim necessarily fails because AFG's reasonable reliance on misrepresentations made prior to the execution of the Subscription Agreement is, with the exception of the three Investor Presentation representations (discussed in Section I(b) below), precluded by the Agreement's integration, no-representation, and no-reliance clauses.[5]

As an initial matter, AFG's contention that a court cannot determine whether reliance was reasonable on a motion to dismiss is incorrect. Though often a question of fact, a fraud claim can be disposed of on a motion to dismiss if the pleadings demonstrate that the plaintiff is a

---

[5] The Individual Counterclaim-Defendants assert (and AFG does not dispute) that they may invoke the provisions of the Subscription Agreement.

sophisticated party and its reliance was unreasonable under the facts pleaded. *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 547 (S.D.N.Y. 2011).

AFG cites *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 407 (S.D.N.Y. 2004) for the proposition that a court cannot determine as a matter of law that its reliance was unreasonable because New York courts take a "contextual" view, focusing on the level of sophistication of the parties, the relationship between them, and the information available to them at the time of the operative decision. But *Winnick* dealt with post-contract misrepresentations that defendants claimed should have triggered a further duty to inquire; it did not involve specific disclaimers found in the body of the relevant contract, like the ones at issue here. In cases involving specific disclaimers of reliance on pre-contractual statements and representations, courts have no trouble concluding, as a matter of law, that a pleader has failed to plausibly allege reasonable reliance. *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 280 (2011); *Arfa v. Zamir*, 17 N.Y.3d 737, 739 (2011). Even in the absence of specific disclaimers, whether a plaintiff has adequately pleaded reasonable reliance can be a proper subject for a motion to dismiss. *See, e.g., Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999).

For the reasons set forth below, the Court holds that – aside from the three Investor Presentation representations – AFG's reliance on the alleged pre-Agreement misrepresentations was unreasonable as a matter of law.

### i.    The Disclaimers In The Subscription Agreement Are Specific

Under New York law, "a specific disclaimer [in an agreement] destroys the allegations in [a] plaintiff's complaint that the agreement was executed upon . . . contrary oral representations." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 321 (1959).

AFG argues that the Subscription Agreement's disclaimers do not specifically disclaim reliance on the particular misrepresentations alleged by AFG. Section 10(g)'s integration clause, for instance, states only that the "Subscription Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof."

It is true that "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made," does not, by itself, bar a claim of fraudulent inducement. *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017) (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d. Cir. 1993)). But even if Section 10(g)'s integration clause, standing alone, is too general to bar AFG's fraudulent inducement claim, reading the integration clause in conjunction with the other clauses in the Agreement makes clear that the Subscription Agreement's disclaimers are sufficiently specific and so preclude AFG from reasonably relying on alleged pre-Agreement misrepresentations. *See Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).

Section 5(c), for example, provides that, "Except for the representation, warranties and agreements of [BEN] set forth in this Subscription Agreement, [AFG] is relying exclusively on its own sources of information, investment analysis and due diligence (including professional advice it deems appropriate) with respect to the Business Combination, the Subscribed Shares and the business, condition (financial and otherwise), management, operations, properties and prospects of the [BEN] and PubCo, including all business, legal, regulatory, accounting, credit and tax matters."

In Section 11, AFG further "acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person *other than the statements,*

11

*representations and warranties of [BEN] contained in the Disclosure Documents* in making its investment or decision to invest in [BEN]." Subscription Agreement Section 11 (emphasis added). Section 5(e), in turn, sets out the Disclosure Documents on which AFG is permitted to rely – the IPO Prospectus, any SEC filings, the Business Combination Agreement, and the Investor Presentation.

These provisions are sufficiently specific. Courts routinely find that disclaimers stating that a defendant makes no representations other than those made in identified documents are specific enough to bar a plaintiff's reasonable reliance on representations made outside of those designated documents. *See Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 461 (S.D.N.Y. 2003) (collecting cases); *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996); *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 465–66 (S.D.N.Y. 2016), *aff'd*, 759 F. App'x 42 (2d Cir. 2019).

The Court is not persuaded by AFG's assertion that these contract clauses are not sufficiently specific because they do not specifically mention BEN's technological capabilities, BEN's patent portfolio, Nunally's credentials, and BEN's supposed partnerships with Sensely and a Mercedes Benz vendor. A contract term can be sufficiently specific even if there is no precise identity between the alleged misrepresentation and the particular disclaimer. *See Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984). Section 5(c) of the Subscription Agreement provides that aside from the representations and warranties set forth in the Agreement, AFG is relying on its own due diligence "*with respect to the Business Combination, the Subscribed Shares and the business, condition (financial and otherwise), management, operations, properties and prospects of the [BEN] and PubCo, including all business, legal, regulatory, accounting, credit and tax matters.*" (emphasis added). The substance of this disclaimer – especially when read

12

in conjunction with the other contract provisions – sufficiently tracks the substance of the alleged misrepresentations, notwithstanding any semantic discrepancies. *See Grumman Allied Indus., Inc.*, 748 F.2d at 735; *Danann*, 5 N.Y.2d at 320–21.

### ii. Even If The Subscription Agreement's Disclaimers Were Not Sufficiently Specific, AFG's Reliance Was Unreasonable Because AFG Is A Sophisticated Party And Its Reliance Is Inconsistent With Other Contractual Representations

Even in the absence of a specific contractual disclaimer, a fraud claim may still be barred where a general disclaimer "is included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 622-23 (S.D.N.Y. 2001). Both are true here: the specific disclaimers at issue were included in a $32.5 million dollar transaction negotiated by sophisticated parties and they are fundamentally inconsistent with AFG's fraud counterclaim.

### 1. *AFG Is A Sophisticated Party*

AFG argues that the Court cannot draw inferences about its sophistication on a motion to dismiss. Not so. The Subscription Agreement and AFG's own pleadings leave little doubt that AFG is a sophisticated party. *See, e.g., McBeth v. Porges,* 171 F. Supp. 3d 216, 226 (S.D.N.Y. 2016); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 547 (S.D.N.Y. 2011); *MP Cool Invs. Ltd. v. Forkosh*, 142 A.D.3d 286, 291–92 (2016).

*First*, AFG holds itself out as a sophisticated investor in the Subscription Agreement. In Section 5(f) of the Agreement, for example, AFG expressly represents that "it is a ***sophisticated investor***, experienced in investing in private placement transactions and capable of evaluating investment risks independently, both in general and with regard to all transactions and investment strategies involving a security or securities, and has exercised independent judgment in

13

evaluat[ing] its participation in the purchase of the Subscribed Shares." Subscription Agreement Section 5(f) (emphasis added). Additionally, AFG holds itself out in its Accredited Investor Questionnaire (Exhibit A to the Subscription Agreement) as "an entity in which <u>all</u> of the equity owners qualify as an accredited investor," as defined by the U.S. Securities Act of 1933 (emphasis in original). *See Longo v. Butler Equities II, L.P.*, 718 N.Y.S.2d 30, 31-32 (2000). The Questionnaire also reveals that AFG was formed in 1997 and so had been in the business for over 25 years at the time it agreed to purchase the Subscribed Shares. AFG does not allege that it did not understand these contract terms at the time of signing or that these particular provisions were separately procured by fraud. Nor does AFG allege that it is *not* a sophisticated party – though if it did, that allegation would be contradicted by the terms of the Agreement itself.

*Second*, it is clear that this is a multi-million dollar transaction, with the Subscription Amount valued at $32.5 million. By entering into a Subscription Agreement of such substantial magnitude, AFG is presumptively a sophisticated investor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

*Third*, while AFG contends that nothing in the pleadings or the Subscription Agreement suggests that there were extended negotiations, let alone *any* negotiations, prior to the signing of those documents, AFG's own pleadings allege that the parties negotiated over the span of several months before executing the Subscription Agreement. The first heading under the "Factual Allegations" section of AFG's counterclaims is "AFG *Begins Negotiations* with BEN, Which Was Preparing To Get Taken Public by a SPAC." Counterclaim at p. 19 (emphasis added). And AFG's pleading is replete with references to the parties' negotiations, which allegedly began in June of 2023. AFG itself alleges, for instance, that, "Throughout the discussions, negotiations, and dealings that culminated in AFG's investment in BEN, from the summer of 2023 through March

14

of 2024, AFG relied on Gaertner and DHC's diligence of the IP[.]" Counterclaim ¶ 65. By AFG's own admission, the parties negotiated for at least three months before executing the Subscription Agreement in September of that year. AFG cannot have it both ways.

The Court thus has little difficulty concluding that AFG qualifies as a sophisticated party as a matter of law.

### 2. *AFG'S Allegation of Reasonable Reliance Is Inconsistent With Other Contractual Provisions In The Subscription Agreement*

AFG's reasonable reliance on the alleged extra-contractual misrepresentations is also inconsistent with the Subscription Agreement's language.

In Section 5(e) of the Agreement, AFG "represents and agrees" that it and its professional advisors, if any, "have had the full opportunity to ask questions of [BEN and DHC] management [and] receive such answers and obtain such information" as was deemed necessary to make an investment decision with respect to the Subscribed Shares. The same section states that "[AFG] has conducted its own investigation of [DHC] and [BEN] and the Subscribed Shares and [AFG] has made its own assessment and ha[s] satisfied itself concerning the relevant tax and other economic considerations relevant to its investment in the Subscribed Shares."

Likewise, Section 5(h) provides that "In making its decision to purchase the Subscribed Shares, [AFG] has relied solely upon independent investigation made by [AFG] *and the representations and warranties of [BEN] set forth herein.*" Subscription Agreement Section 5(h) (emphasis added).

Section 5(h) also states that "[AFG] had access to, and an adequate opportunity to review, financial and other information as [AFG] deems necessary in order to make an investment decision with respect to the Subscribed Shares."

Section 5(f) further provides that "[AFG] has determined based on its own independent review, and has sought such professional advice as it deems appropriate, that its purchase of the Subscribed Shares (i) is fully consistent with its financial needs, objectives and condition . . . and (v) is a fit, proper and suitable investment for [AFG], notwithstanding the substantial risks inherent in investing in or holding the Subscribed Shares. [AFG] is able to bear the substantial risks associated with its purchase of the Subscribed Shares, including the loss of its entire investment therein."

The Subscription Agreement is clear: in deciding whether to purchase the Subscribed Shares, AFG relied on its own investigation and the various Disclosure Documents that are described in Section 11. AFG's claim that "the investment was depicted falsely due to [Counterclaim-Defendants' extra-contractual] representation[s]" is therefore plainly inconsistent with its own contractual representations indicating that it did not rely on any extra-contractual representations in deciding whether to purchase the Subscribed Shares. *See Danann*, 5 N.Y.2d at 320; *Negrete*, 187 F. Supp. 3d at 465–66. AFG does not contest that, aside from the three Investor Presentation representations, the pre-Agreement misrepresentations fall outside the scope of the Disclosure Documents on which AFG was entitled to rely under the Subscription Agreement.

Contrary to AFG's assertions, these provisions are not "generic and mostly or entirely boilerplate." Dkt. No. 50 at 9. A review of the contract language, which AFG does not independently allege was procured by fraud, shows that the Subscription Agreement was not a standard form agreement but was, to some extent, tailored toward the negotiations and deal at issue. There is also evidence that certain contractual terms were bargained for by AFG. Under the Agreement, for example, the closing of the sale is explicitly conditioned on the concurrent consummation of the Business Combination Closing. This reflects AFG's intent to fund future

16

equity investments in BEN with the revenues realized from the sale of BEN's technology in the marketplace – an intention that AFG states was discussed between the parties during the course of negotiations. As AFG itself alleges, it "did not want to invest in BEN unless it could play a role in selling BEN's technology . . . and it did not want to undertake to sell the technology unless it stood to receive upside via an equity investment in [BEN]" Counterclaim ¶ 24.

The Court can fairly infer that AFG's officers read and understood the contract and were aware of the provisions under which AFG averred that it did not rely on any extra-contractual representations in deciding to invest, instead relying on its own due diligence. *See Danann*, 5 N.Y.2d at 321 (1959). Such an inference is particularly appropriate where, as here, a sophisticated party is engaged in arm's length negotiations and is thus under an affirmative duty to protect itself from misrepresentations. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997). Because AFG, as a sophisticated party, had "an enhanced duty to obtain available information material to [an] investment decision," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001), it must show that it has "made an independent inquiry into all available information." *Emergent Cap. Inv. Mgmt.*, 165 F. Supp. 2d at 623. Drawing all inferences in AFG's favor, no facts are pleaded from which the Court could conclude that AFG did so.

Had AFG doubted the veracity of the alleged extra-contractual statements, it could have negotiated for fuller information or more complete representations. *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 322 (S.D.N.Y. 2002). For example, AFG alleges that it agreed to make equity investments in BEN because, among other things, it believed that, based on the alleged misrepresentations, BEN had relevant, usable, and marketable technology and a valuable patent portfolio. AFG could have asked for a demonstration of the technology or to examine the patents

in the purported patent portfolio. AFG also could have conditioned the sale on the truth of the representations that it claims induced it to enter into the Agreement. *See Glob. Mins. & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 100–01 (2006). Alternatively, AFG could have included a condition subsequent that the sale would be rescinded if BEN's AI technology could not readily be commercialized to serve AFG's customers, or if the actual value of BEN's patent portfolio was significantly less than any amount that was represented to AFG. *See Rodas v. Manitaras*, 159 A.D.2d 341, 342-43 (1990).

AFG did none of the above. Instead, AFG expressly disclaimed reliance on any extra-contractual representations and made clear that it was relying only on its own due diligence in deciding whether to purchase the Subscribed Shares. AFG had the opportunity to protect itself against the alleged misrepresentations on which it now claims it relied. AFG's failure to do so is fatal to its fraud claim. *Lazard Freres & Co.*, 108 F.3d 1531 at 1543; *Negrete*, 187 F. Supp. 3d at 465–66.

AFG argues that its contractual representation "acknowledge[ing] that it is aware that there are substantial risks incident to the purchase and ownership of the Subscribed Shares" is "totally irrelevant." Well, no.  AFG, based on its own due diligence, concluded that purchasing the Subscribed Shares was "a fit, proper and suitable investment . . . notwithstanding the substantial risks inherent in investing in or holding the Subscribed Shares, including the loss of its entire investment therein." Subscription Agreement Section 5(f). *See MP Cool Invs. Ltd.*, 142 A.D.3d at 292. Having made and understood this representation in the Agreement, AFG is bound by the contract's terms. *Danann*, 5 N.Y.2d at 322. The fact that BEN may not have performed to AFG's expectations does not relieve AFG of its obligations under the Agreement. *See MP Cool Invs. Ltd.*, 142 A.D.3d at 292; *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 194–95 (2012). It is not the job

of this Court to rewrite the allocation of risks, rights, and obligations agreed to by the parties –

especially where there has been no assertion of unequal bargaining power. *DynCorp*, 215 F. Supp.

2d at 323.

### iii.  AFG Has Not Adequately Alleged That The Underlying Facts Were Peculiarly Within Counterclaim-Defendants' Knowledge

AFG argues in its opposition brief that its claims fall within the recognized exception to

the specific disclaimer rule for misrepresented facts that are "peculiarly within" the knowledge of

the other party. *See Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136

(2d Cir. 1998); *Danann*, 5 N.Y.2d at 322. According to AFG, "matters such as whether BEN's

technology worked, whether BEN's chief scientist actually earned a PhD, the true condition of

BEN's patent portfolio, and whether BEN had partnered with certain companies were, as pled and

by their nature, all facts available to BEN and not AFG." Dkt. No. 50 at 12.

This conclusory assertion finds no factual support in AFG's pleadings. AFG has not alleged

that "matters such as whether BEN's technology worked, whether BEN's chief scientist actually

earned a PhD, the true condition of BEN's patent portfolio, and whether BEN had partnered with

certain companies were, as pled and by their nature" could not be discovered through the exercise

of ordinary diligence. *See Allstate Ins. Co. v. Stanley*, 2013 WL 2369953, at *15 (N.Y. Sup. Ct.

Mar. 14, 2013) (quoting *China Dev. Indus. Bank v. Morgan Stanley & Co. Inc.*, 86 AD3d 435, 436

(1st Dept 2011)); *Coraud LLC v. Kidville Franchise Co., LLC*, 109 F. Supp. 3d 615, 620 (S.D.N.Y.

2015); *Cf. NRAM PLC v. Societe Generale Corporate and Inv. Banking*, WL 3924619, at *12 (N.Y.

Sup. Ct. Aug. 05, 2014).

An example is illustrative. AFG alleges that on June 21, 2023, Lucas sent Brewer an email

attaching a slide deck and spreadsheet of 40 patents or patent applications supposedly owned by

BEN, known as the "Nunchi" patents. The slide deck included a statement that BEN's patent

19

portfolio "has already been rigorously defined and tested making it extraordinarily strong," with a footnote stating that the patents had been "litigated against Google, with Favorable Federal construction in Markman and IPR proceedings." According to AFG, at least three of the listed patents were abandoned applications that conferred no rights on BEN, and BEN's patents had not in fact received favorable construction. AFG later learned that, between 2012 and 2014, Nunally – the inventor of the Nunchi patents – assigned the patents to a penny stock company and patent "troll" named e.Digital Corporation, which extracted only nuisance settlements from the patents before filing for federal bankruptcy protection in 2017. Alphabet Inc./Google Inc. – the owner of some of the targets of e.Digital's enforcement campaign – initiated an inter partes review ("IPR") of the patents, threatening to invalidate them; the matter was ultimately settled. In e.Digital's bankruptcy proceedings, its Chapter 7 Trustee stated that e.Digital was not able to monetize the patents for anything beyond nuisance value and could not find a buyer for the patent portfolio, leading the Trustee to conclude that the patents are worth very little.

All of this information was available to the public in 2017 in connection with e.Digital's federal bankruptcy proceedings – six years before AFG ever entered into negotiations with BEN. AFG does not allege any reason why it could not have discovered this information before signing the Agreement just by exercising ordinary diligence. Simply demanding to know the names of the lawsuits in which the patents had been validated or received favorable Markman rulings, or asking for copies of those rulings, would have revealed a great deal and led to the discovery of additional facts that are listed by AFG as important but not disclosed.

AFG argues that "To the extent some of the alleged facts about the patent portfolio derive from (relatively obscure) records and therefore theoretically could have been uncovered ex ante . . . AFG was not required to conduct *exhaustive* due diligence." Dkt. No. 50 at 12–13. But none of

20

AFG's factual allegations could plausibly support a finding that discovery of this publicly accessible information would require anything more than ordinary diligence. AFG, as a sophisticated party entering into an arm's length business transaction, had an affirmative duty to investigate the nature of the transaction and conduct an independent appraisal of the risk it was assuming. *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999). This is particularly true where, as here, the nature of the risk could have been ascertained by reviewing publicly available information. *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195 (2012). Having had the means to discover this information through the exercise of ordinary diligence yet failing to make use of those means, AFG cannot now claim reasonable reliance. *Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 99 (1997).

The fact is, AFG has not alleged any facts tending to show that the information it claims was withheld from it was peculiarly within the knowledge of Counterclaim-Defendants. All of it was readily discoverable. But assuming *arguendo* that the information was peculiarly within Counterclaim-Defendants' knowledge, AFG could have negotiated to condition the sale on the truth of Counterclaim-Defendants' representations concerning the value of BEN's patent portfolio, which AFG alleges induced it into signing the Subscription Agreement. *See LMM Cap. Partners, LLC v. Mill Point Cap., LLC*, 224 A.D.3d 504, 508 (2024). AFG did not do so; on the contrary, it represented that it was not relying on any undisclosed information. It thereby "willingly assumed the business risk that the facts may not be as represented." *Glob. Mins. & Metals Corp. v. Holme*, 824 N.Y.S.2d at 216.

### b. INVESTOR PRESENTATION MISREPRESENTATIONS

AFG alleges that on September 7, 2023 – the day on which the Subscription Agreement was executed – BEN provided AFG with an Investor Presentation in the form of a slide deck,

which contained three false or misleading representations: that BEN had "currently available Multi-modal conversational AI & AI Avatars: Fully Customizable 'Human-like' AI & AI Avatars;" that BEN had a pre-money equity value of $250 million; and that Patrick Nunally had a Ph.D.

The alleged misrepresentations in the Investor Presentation are not precluded by the specific disclaimer rule, because the Investor Presentation is listed in the Agreement as one of the Disclosure Documents on which AFG was allowed to rely. Nevertheless, Counterclaim-Defendants argue that AFG could not reasonably rely on the representations in the Investor Presentation because AFG acknowledged in the Subscription Agreement that "the information contained in the Disclosure Documents is subject to change" and represented that "any changes to the information contained in the Disclosure Documents . . . shall in no way affect [AFG's] obligation to purchase the Subscribed Shares" and that "in purchasing the Subscribed Shares, [AFG] is not relying upon any projections contained in the Investor Presentation." Subscription Agreement Section 5(e). Additionally, the Investor Presentation itself includes a disclaimer stating that "no representations or warranties, express, implied or statutory are given in, or in respect of, this Presentation, and no person may rely on the information contained in this Presentation."

Because the Investor Presentation is explicitly listed in the Subscription Agreement as one of the Disclosure Documents on which AFG was entitled to rely in making an investment decision, the Court cannot conclude, at the pleading stage, that AFG's reliance was unreasonable as a matter of law.

In the alternative, Counterclaim-Defendants argue that these three representations were immaterial opinions. I disagree.

The Court has no trouble concluding that the representations that BEN had "currently available Multi-modal conversational AI & AI Avatars: Fully Customizable 'Human-like' AI & AI

Avatars" and a pre-money equity value of $250 million would be material to an investor's decision to enter into a transaction. *See Nuss v. Sabad*, 976 F. Supp. 2d 231, 250 (N.D.N.Y. 2013). And while the I am skeptical that the representation that Nunally had a Ph.D. was material to AFG's decision to make a $32.5 million investment, I cannot conclude, at this juncture, that this is "so obviously unimportant . . . that reasonable minds could not differ on the question of [its] importance." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Nor can the Court find, as a matter of law, that these representations are inactionable opinions. Although a projection of future value cannot sustain an action for fraud, the statement that BEN had currently available avatars is not an opinion or a projection – it sounds like a flat-out statement of material fact. The Court certainly cannot conclude, as Counterclaim-Defendants urge, that the representation that BEN had "currently available Multi-modal conversational AI & AI Avatars: Fully Customizable 'Human-like' AI & AI Avatars" is merely a subjective claim which cannot be proven true or false. *See Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 365 (S.D.N.Y. 2021). A reasonable investor could plausibly interpret this statement as a specific representation that BEN had, at the very least, functioning AI technology. *See Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 348 (S.D.N.Y. 2020). And while a factfinder at trial might ultimately conclude that this statement was merely a negotiating tactic rather than a factual misrepresentation, I cannot conclude as a matter of law that it was a negotiating tactic, as opposed to a representation of fact.

AFG's allegation that Counterclaim-Defendants had no functioning technology whatsoever precludes a finding that this representation, made in a document on which AFG was expressly entitled to rely, is inactionable as a matter of law. *See Basquiat ex rel. Est. of Basquiat v. Sakura*

23

*Int'l*, 2005 WL 1639413, at \*5 (S.D.N.Y. July 5, 2005); *Sommer v. PMEC Assocs. & Co.*, 1992 WL 196748, at \*5 (S.D.N.Y. Aug. 5, 1992).

And, at the pleading stage, I cannot conclude that the $250 million pre-money equity value was a future projection, as opposed to a representation of existing fact. *See* Dkt. No. 40-2 at 14; *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 172 (1986). For the same reason, it is of no moment that AFG represented in the Subscription Agreement that it "is not relying upon any projections contained in the Investor Presentation." Counterclaim-Defendants may ultimately prevail on their assertion that AFG's reliance on the $250 million representation in the Investor Presentation was unreasonable, but they cannot procure dismissal of that claim in a pre-answer motion under Rule 12(b)(6).

The Court also rejects Counterclaim-Defendants' argument that AFG fails to directly link Nunally and Chang to the Investor Presentation representations. How the Investor Presentation was prepared is within the sole knowledge of BEN and the Individual Counterclaim-Defendants. Although Rule 9(b) requires a plaintiff to allege fraud with particularity as against each Counterclaim-Defendant, this rule is relaxed where such information is exclusively within the other party's knowledge. *See DGM Invs., Inc. v. New York Futures Exch., Inc.*, 265 F. Supp. 2d 254, 264 (S.D.N.Y. 2003); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 250 (S.D.N.Y. 2005). At this early stage, AFG's allegations are sufficient to put the Individual Counterclaim-Defendants on notice of the counterclaims against them. The Court therefore declines to dismiss AFG's counterclaims concerning the alleged Investor Presentation misrepresentations at the pleading stage.

24

### c. ALLEGED MISREPRESENTATIONS MADE AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT BUT PRIOR TO THE AMENDMENT

As a threshold matter, I do not agree with AFG that BEN has waived its right to argue that AFG's fraud claim is precluded by the terms of the Amendment. While arguments generally may not be made for the first time in a reply brief, "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Bravia Cap. Partners, Inc. v. Fike*, 296 F.R.D. 136, 144 (S.D.N.Y. 2013) (quoting *Bayway Ref. Co. v. Oxygenated Mktg. & Trading*, 215 F.3d 219, 226–27 (2d Cir. 2000)). BEN's reply brief does not raise new issues or arguments, but rather addresses arguments raised in AFG's opposition brief. Because BEN's arguments are responsive to AFG's memorandum of law in opposition, BEN has not improperly asserted arguments for the first time in its reply brief.

The parties disagree about what law governs here. Unlike the Subscription Agreement, which is governed by the laws of New York, the Amendment is governed by Delaware law, although the law underlying AFG's fraud claim is substantially the same in Delaware and New York. *See Ascento Cap., LLC v. MinervaWorks, LLC*, 2021 WL 2206487, at *8 n.8 (S.D.N.Y. June 1, 2021); *HF Lexington KY LLC v. Wildcat Synergy Manager LLC*, 2012 WL 1279933, at *6 n.6 (N.Y. Sup. Ct. 2012). There is really no serious argument that Texas law, which AFG seeks to apply, does not in fact apply. But AFG's assertion that the Court should apply Texas law is belied by the plain language of the Amendment, which provides that the Amendment "shall be construed in accordance with and governed by the laws of Delaware applicable to contracts wholly performed within the borders of such state, without giving effect to the conflict of law principles thereof." Dkt. No. 49-1, Section 4.8.

Turning to the merits, AFG alleges that, in addition to the misrepresentations allegedly made prior to the execution of the Subscription Agreement, it was fraudulently induced to enter into the Amendment based on the following representations:

*First*, on September 26, 2023, Lucas, on behalf of BEN, stated in a text message to Brewer: "Anthropic is another LLM like Bard, ChatGPT for generative AI. Our platform has its own LLM and yet can tap into anyone of these others if permitted." Counterclaim ¶ 74.

*Second*, on September 29, 2023, both Lucas and Gaertner wrote to Brewer, stating that BEN's valuation was $250 million prior to the Merger. Gaertner's email to Brewer attached a spreadsheet stating, "here is the model," and forwarded an email from BEN's counsel which noted that "The attached is the deal model we've been provided by Cohen [DHC's financial advisor], which shows a pre-money valuation of $250 million prior to (1) the AFG deal, and (2) the deSPAC." Counterclaim ¶ 75.

*Third*, on September 29, 2023, Lucas told Brewer via text message that "comps are all coming in $500-1B for others without any product near ours." Counterclaim ¶ 77.

AFG's contention that it reasonably relied on these alleged misrepresentations is barred by the terms of the Amendment. Under the Amendment, AFG made the following relevant representations:

> 2.1.4. Experience, Financial Capability and Suitability. The Subscriber is: (i) sophisticated in financial matters and is able to evaluate the risks and benefits of the investment in the Shares and (ii) able to bear the economic risk of its investment in the Shares for an indefinite period of time because the Shares have not been registered under the Securities Act (as defined below) and therefore cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available. The Subscriber is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests. The Subscriber must bear the economic risk of this investment until the Shares are sold pursuant to: (x) an effective registration statement

> under the Securities Act or (y) an exemption from registration available with respect to such sale. The Subscriber is able to bear the economic risks of an investment in the Shares and to afford a complete loss of the Subscriber's investment in the Shares.
>
> 2.1.5. Access to Information; Independent Investigation. Prior to the execution of this Agreement, the Subscriber has had the opportunity to ask questions of and receive answers from representatives of the Company concerning an investment in the Company, as well as the finances, operations, business and prospects of the Company, and the opportunity to obtain additional information to verify the accuracy of all information so obtained. In determining whether to make this investment, the Subscriber has relied solely on the Subscriber's own knowledge and understanding of the Company and its business based upon the Subscriber's own due diligence investigation and the information furnished pursuant to this paragraph. The Subscriber understands that no person has been authorized to give any information or to make any representations which were not furnished pursuant to this Section 2, and the Subscriber has not relied on any other representations or information in making its investment decision, whether written or oral, relating to the Company, its operations or its prospects.

Dkt. No. 54-1. As with the Subscription Agreement, these are not general, boilerplate contractual clauses; the Amendment expressly contemplates the situation of which AFG now complains.

AFG's assertion that the Section 2.1.5 of the Amendment "invit[es] reliance on all company-supplied information," Dkt. No. 50 at 20, is belied by a plain reading of the Amendment. Section 2.1.5 does not invite reliance on *all* company-supplied information; rather, Section 2.1.5 allows AFG to rely only on answers from BEN representatives received in response to AFG's questions about its investment and BEN's finances, operations, and business prospects. AFG explicitly represented that, aside from this information and its own investigation, it did not rely on any representations in making its investment decision, and that it understood "that no person has been authorized to give any information or to make any representations which were not furnished pursuant to this Section."

AFG does not allege, and the Court cannot reasonably infer from AFG's pleadings, that the three alleged misrepresentations at issue – or any others made prior to the execution of the Subscription Agreement – were made in response to questions AFG asked BEN's representatives pursuant to Section 2.1.5. Even assuming *arguendo* that AFG could reasonably rely on these representations in accordance with Section 2.1.5, the same sentence provides that AFG had the "opportunity to obtain additional information to verify the accuracy of all information so obtained." AFG could have easily discovered the truth through the exercise of ordinary diligence, and it does not allege otherwise. Instead, AFG chose to take these representations at face value. AFG's failure to make use of the means of verification that were available to it precludes, as a matter of law, AFG's reasonable reliance on these representations. See *HSH Nordbank AG*, 95 A.D.3d at 194–95.

Accordingly, the Court finds that AFG's reliance on the alleged post-Subscription Agreement, pre-Amendment representations is unreasonable as a matter of law. *See Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 547 (S.D.N.Y. 2011); *Belin v. Weissler*, 1998 WL 391114, at *7 (S.D.N.Y. July 14, 1998).

### d. REGISTRATION STATEMENT REPRESENTATIONS

AFG alleges that a February 12, 2024 Form S-4 registration statement (the "Registration Statement"), filed with the SEC by DHC prior to its Merger with BEN, contained untrue or materially misleading statements.[6] Specifically, AFG challenges a statement that Gaertner and DHC "conducted detailed intellectual property . . . diligence of BEN" and that "Between April 25 and September 7, 2023, DHC conducted . . . intellectual [property] due diligence review of BEN." Counterclaim ¶¶ 58, 66; Registration Statement at 107–08. AFG claims that Gaertner and DHC

---

[5] The Court takes judicial notice of the Registration Statement, available at https://www.sec.gov/Archives/edgar/data/1838163/000119312524032208/d566788ds4a.htm.

could not have conducted what a reasonable investor would have understood to be detailed due diligence of BEN's IP portfolio because had they done so, they would have surely learned that BEN's intellectual property was basically worthless. Counterclaim ¶ 67.

AFG also challenges a representation in the Registration Statement that, as part of its due diligence, DHC received "multiple live demonstrations of BEN's artificial intelligence product offerings indicating their readiness and potential for commercial viability." Counterclaim ¶ 69; Registration Statement at 112. In AFG's view, any demonstrations that DHC and Gaertner may have received could not have possibly indicated the readiness and potential for commercial viability of BEN's supposed "product offerings," rendering this statement false or misleading.

But none of the alleged misrepresentations in the Registration Statement are actionable because AFG does not allege that it relied on any representations in the Registration Statement – whether reasonably or unreasonably – in deciding whether to purchase the Subscribed Shares. Nor could it. While AFG was entitled, under the Subscription Agreement, to rely on SEC documents in making an investment decision, the Registration Statement was filed *more than four months* after AFG had already entered into the Subscription Agreement and the Amendment. *See Dealtime.com v. McNulty*, 123 F. Supp. 2d 750, 760 (S.D.N.Y. 2000). Whether the Registration Statement "covered" the Shares to be issued to AFG at the Merger close, as AFG argues, is irrelevant. Likewise, it is of no moment that, but for the existence of the Registration Statement, the Merger would not have closed, and the Shares of BEN would not have been issued to AFG. The relevant question is whether AFG relied on the representations in the Registration Statement when it decided to purchase the Subscribed Shares. It did not. The Registration Statement did not yet exist when AFG made its investment decision, and the pleading does not allege that AFG was given a draft of the Registration Statement prior to the time it made that decision. End of story.

## II.   COUNT 2: MISTAKE

As an alternative to its claim for fraud and fraudulent inducement, AFG seeks rescission of the Subscription Agreement and Amendment on grounds of mutual mistake or, alternatively, unilateral mistake.

Like AFG's claim for fraud and fraudulent inducement, its mistake claim is subject to Rule 9(b)'s heightened pleading standards. *See* Fed. R. Civ. P. 9(b); *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 248 (S.D.N.Y. 2006). For the reasons set forth below, AFG has failed to state a mutual or unilateral mistake claim – even under Rule 8(a)(2)'s more lenient pleading standard.

### a.   MUTUAL MISTAKE

AFG first seeks rescission of the Subscription Agreement on the basis that, when the parties entered into the Agreement, both parties mistakenly believed that (1) BEN had AI technology that could readily be commercialized to serve AFG's customers and (2) BEN's patent portfolio had significant value. Dkt. No. 17 ¶ 94.

Under New York law, a mutual mistake exists where "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *EGW Temporaries, Inc. v. RLI Ins. Co.*, 919 N.Y.S.2d 752, 753 (2011). A party alleging a mutual mistake must show "that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." *Rodriguez v. Mower*, 56 A.D.3d 857, 858 (2008). To support rescission, the mutual mistake "must be so material that it goes to the foundation of the agreement." *BP Prods. N. Am. Inc. v. Blue Hills Fuels, LLC*, 2022 WL 16540804, at *4 (S.D.N.Y. Oct. 28, 2022) (internal citation omitted). However, the doctrine of mutual mistake may not be invoked by a party to avoid the consequences of its own negligence, including a failure to investigate, or where the party seeking to invoke it "bears the risk of a mistake because he was aware of his limited knowledge

but acted anyway." *ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699, 701 (S.D.N.Y. 2013), *aff'd*, 552 F. App'x 24 (2d Cir. 2014); *P.K. Dev., Inc. v. Elvem Dev. Corp.*, 640 N.Y.S.2d 558, 560 (1996).

AFG has not alleged any facts tending to show that the parties' understanding of the Subscription Agreement at the time of its execution differed from the Agreement's actual language, or that BEN mistakenly believed it had commercial-ready AI technology and a valuable patent portfolio. This alone is fatal to its mutual mistake claim. *See Yurman Design, Inc. v. Garden Jewelry Mfg. Corp.*, 2003 WL 22047896, at *3 (S.D.N.Y. Aug. 29, 2003).

Even if AFG had plausibly alleged that both parties mistakenly believed that BEN had commercial-ready AI technology and a valuable patent portfolio, AFG's mutual mistake claim would still fail, for two reasons.

*First*, at least with respect to the value of BEN's patent portfolio, a mistake in valuation – as opposed to the subject of the exchange – does not warrant rescission of a contract. *See Highmount Olympic Fund, LLC v. PIPE Equity Partners, LLC*, 940 N.Y.S.2d 49, 50 (2012).

*Second*, such mistaken beliefs would be the result of AFG's own conscious ignorance. *See P.K. Dev., Inc.*, 640 N.Y.S.2d at 560. AFG, in the exercise of ordinary care, could have (and should have) ascertained the status of BEN's AI technology and the value of its patents before signing onto this significant investment. This is true even if AFG had to go beyond its own efforts to ascertain the relevant facts, such as obtaining expert opinions on BEN's AI technology and patent portfolio. *Id*. Moreover, if AFG's purchase of the Subscribed Shares was dependent on BEN having valuable patents and AI technology that was ready to be commercialized "in ways that would serve AFG's customers," the Subscription Agreement should have made this explicit. It did not. To the contrary, the express terms of the Subscription Agreement make clear that AFG – and AFG alone – bore the risk that BEN's patent portfolio would not prove valuable, and that its AI technology

was not ready to be commercialized in a way that would serve AFG's customers. The only "mistake" here was AFG's failure to conduct a reasonable investigation prior to entering into the Subscription Agreement. And that was not a mutual mistake.

### b. UNILATERAL MISTAKE

In the alternative, AFG seeks rescission under the doctrine of unilateral mistake. This fares no better.

As with its claim for mutual mistake, AFG alleges that "a unilateral mistake existed by virtue of AFG's mistaken beliefs, which were not shared by BEN but as to which BEN knew or should have known that AFG had mistaken beliefs, that (1) BEN had AI technology that could readily be commercialized to serve AFG's customers and (2) BEN's patent portfolio had significant value." Dkt. No. 17 ¶ 95.

A unilateral mistake occurs when "only one of the parties to a bilateral transaction is in error." *Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (quoting 21 N.Y. Jur.2d Contracts § 121 (1982)). New York law does not permit rescission of a contract for unilateral mistake alone; a unilateral mistake must be "coupled with some fraud." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). *See also Kotick v. Shvachko*, 14 N.Y.S.3d 8, 9 (2015). In order for a court to allow rescission of a contract on the basis of unilateral mistake, a plaintiff must establish that: (1) he entered into a contract under a mistake of material fact, and (2) the other contracting party either knew or should have known that such a mistake was being made. *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 429 (S.D.N.Y. 2015).

Significantly, a court will not vacate a contract on the ground of unilateral mistake where a party's mistake was the result of its own negligence or failure to exercise ordinary care. *See ATS-*

*1 Corp. v. Rodriguez*, 67 N.Y.S.3d 60, 62-63 (2017). Such is the case here, for the reasons described above. *See supra* Sections I(a)(iii), I(b).

## III.  TEXAS SECURITIES ACT COUNTERCLAIMS

Finally, AFG brings counterclaims under Texas Government Code §§ 4008.052, 4008.055(a), and 4008.055(c) (the "Texas Securities Act" or "TSA"), which establishes a cause of action for misrepresentations or omissions made in connection with a securities transaction.

AFG asserts primary liability counterclaims against BEN,[7] Lucas, and Gaertner pursuant to Section 4008.052 of the TSA and secondary liability counterclaims against Lucas, Chang, Gaertner, and Nunally under Sections 4008.055(a) and 4008.055(c). AFG contends that these Counterclaim-Defendants offered and sold the Subscribed Shares to AFG "by means of untrue or misleading statements of material fact concerning BEN's capabilities, technology, partnerships, and the credentials of its chief scientist and the named inventor on the IP that BEN claimed was worth many hundreds of millions of dollars." Counterclaim ¶ 103.

### a.  COUNT 3: PRIMARY VIOLATOR LIABILITY

Section 4008.052 of the Texas Securities Act provides that "a person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary" is liable to the buyer of the security. Tex. Gov't Code Ann. § 4008.052(a). To state a claim under the TSA, a buyer of a security must plausibly allege that the security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is

---

[7] AFG alleges that Prior BEN is liable as a primary violator despite Prior BEN's not being a party to this action. *See* Counterclaim ¶ 102 n.2 ("AFG has not named Prior BEN as a Counterclaim-Defendant in this action even though Prior BEN is a primary violator as set forth in this Count and is liable as such."). As Prior BEN is not a party to this action, the Court lacks jurisdiction to award a judgment against Prior BEN. To the extent AFG seeks to hold Prior BEN liable as a primary violator for purposes of its secondary liability counterclaims, however, it may do so even in Prior BEN's absence. *See Summers v. WellTech, Inc.*, 935 S.W.2d 228, 231 (Tex. App. 1996).

necessary in order to make the statements made not misleading. *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App. 2018).

Counterclaim-Defendants argue that, aside from the three alleged misrepresentations in the Investor Presentation, AFG's TSA counterclaim is, like its claim for common law fraud, barred by the Subscription Agreement's integration, no-representation, and no-reliance clauses. These contractual clauses relate primarily to AFG's ability to *rely* on extra-contractual representations. But reliance is not an element of a violation of the TSA; a plaintiff does not need to that the misrepresentation or omission caused it to purchase the security. *See Wood v. Combustion Eng'g, Inc.*, 643 F.2d 339, 345 (5th Cir. 1981). Likewise, under the TSA, a buyer is not required to perform due diligence in order to verify the veracity of a seller's claims or to discover the truth by exercising ordinary care. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 567 (S.D. Tex. 2002). The focus of the TSA is on whether the seller made a material misrepresentation or omission – not on the conduct of the buyer. *Kubbernus*, 574 S.W.3d at 480.

Because reliance is not an element of a TSA claim, Counterclaim-Defendants have failed to point to any contractual provision that would negate the existence of an essential element of AFG's TSA claim. *See Aegis Ins. Holding Co., L.P. v. Gaiser*, 2007 WL 906328, at *5 (Tex. App. Mar. 28, 2007). Accordingly, the Court cannot conclude as a matter of law that AFG's TSA claim is precluded by the terms of the Subscription Agreement. *See Khoury v. Tomlinson*, 518 S.W.3d 568, 582 (Tex. App. 2017).

Counterclaim-Defendants' reliance on *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482 (Tex. 2005) is misplaced. *Geodyne* did not involve contractual anti-reliance provisions. Instead, the *Geodyne* court declined to consider whether the TSA offered a defense to sellers for alleged misrepresentations that could have reasonably been discovered because there

was no misrepresentation in the first instance. *Id.* at 488–89. Specifically, the court found no evidence of a misrepresentation of valid title because a quitclaim deed without warranty of title cannot, by its nature, be a warranty (or "misrepresentation") of title. *Id.* at 487. By offering only a quitclaim deed, the defendant expressly disclosed that what it was selling might turn out to be nothing. *Id.* at 489. The *Geodyne* court's holding thus has no bearing here.

Having determined that AFG's TSA claim is not precluded by the terms of the Subscription Agreement, the Court next considers whether AFG has adequately stated a claim under the TSA.

The parties disagree about whether AFG's TSA counterclaims are subject to Rule 9(b)'s heightened pleading standard or Rule 8's more lenient one. AFG posits that it is not required to meet Rule 9(b)'s particularity standard because Counts 3 and 4 rely on theories of negligent or innocent deception as opposed to intentional fraud. Dkt. No. 50 at 32 n.18.

AFG is correct that Rule 9(b)'s heightened pleading standard applies to securities claims only insofar as those claims are premised on allegations of fraud or mistake. *See* Fed. R. Civ. P. 9(b). To the extent AFG's TSA claims sound in negligence or innocent deception, they would fall outside the purview of Rule 9(b) and would not be subject to heightened pleading requirements.

A review of AFG's pleading, however, does not support an inference that its TSA counterclaims are based in negligent or innocent deception as opposed to intentional fraud. *See Wachovia*, 753 F. Supp. 2d at 374; *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007). Indeed, the crux of AFG's counterclaims is that Counterclaim-Defendants either knew or recklessly disregarded the fact that certain of its representations were false, in order to induce AFG to invest in BEN. That is not negligence. The pleaded facts sound in fraud.

To be sure, the fact that AFG alleges fraud counterclaims would not have precluded it from pleading negligence in the alternative. However, AFG's counterclaims do not contain alternative

35

theories. Counts 3 and 4 expressly incorporate AFG's fraud allegations, *see e.g.*, Counterclaim ¶ 99, and rather than allege any facts in support of a negligence theory, the TSA counterclaims merely rely on AFG's allegations "As set forth above." *See* Counterclaim ¶¶ 102–03; *cf. Wachovia*, 735 F. Supp. 2d at 374. The allegations "set forth above" are premised on Counterclaim-Defendants having "known or recklessly disregarded" that their statements are false – wording classically associated with fraud. *See, e.g.,* Counterclaim ¶ 62. The words "negligent" and "innocent" – or any language from which negligence or innocent deception could reasonably be inferred – are found nowhere in AFG's Counterclaims. The gravamen of AFG's Counterclaims is plainly fraud, and AFG has made no effort to plead any other basis for its TSA counterclaims. Rule 9(b)'s heightened pleading standard therefore applies to AFG's TSA primary violator claim. *See In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 892 (Bankr. S.D. Tex. 2022).[8]

Accordingly, while AFG need not allege scienter or reasonable reliance in support of its TSA claim, it is not relieved from adequately alleging "how" and "why" the statements were fraudulent with the particularity required by Rule 9(b).

Drawing all inferences in AFG's favor, AFG has sufficiently pleaded how and why six alleged misrepresentations concerning BEN's patent portfolio, pre-money equity valuation, and AI technology were false or misleading:

*First*, AFG alleges that on July 17, 2023, Shawn Lucas, on behalf of BEN, and on information and belief, acting at the direction of Michael Lucas, sent an email to Brewer attaching a slide deck relating to BEN's intellectual property. The first and fourth slides stated that BEN's patent portfolio had been "independently valued at $706.57+ Million." AFG alleges that this statement was false or misleading because the Copperpod "Patent Valuation" report on

---

[8] Rule 9(b)'s pleadings standards do not, however, apply to a control person claim once a plaintiff sufficiently pleads an underlying primary violation. *In re Neighbors*, 645 B.R. at 892.

which it was based estimated that BEN could sue certain targets for infringement of Nunally's legacy patents for "hundreds of millions if not billions of dollars" despite sustained failed attempts to monetize the patent portfolio over the prior decade. *See* Counterclaim ¶¶ 47–48.

*Second*, the third slide of the July 17, 2023 deck listed 21 pending patent applications. AFG contends that this representation was false and misleading because five of these applications were not pending but had been abandoned or expired many years earlier, giving BEN no intellectual property rights in connection with those applications.

*Third*, the fifth slide in the July 17, 2023 deck stated that, "This family of patents has been successfully litigated numerous times and is supported by an extremely favorable construction ruling . . . These patents have also been challenged in IPR [inter partes review] by Google and NetGear . . . patents in the family were granted in light of all the raised art defusing IPR proceedings." Counterclaim ¶ 50. AFG claims that these representations were false and misleading because the litigation in question was based on Nunally's legacy patent portfolio, which was never successful, as evidenced in e.Digitial's bankruptcy proceedings. *See* Counterclaim ¶ 60. Additionally, the IPR challenges brought by Google/NetGear were settled, so it was inaccurate to claim that the IPR "granted" those patents "in light of all the raised [prior] art." Counterclaim ¶ 51.

*Fourth*, AFG alleges that a June 21, 2023 email from Shawn Lucas on behalf of BEN to Brewer attached a spreadsheet created by Nunally which was false and misleading because it listed 40 patents or pending applications. In reality, AFG urges, at least three of the patents had been abandoned and thus conferred no rights on BEN.

*Fifth*, AFG alleges that a representation made in the Investor Presentation (and again via text and email from Lucas and Gaertner to Brewer) that BEN had a pre-money equity value of

$250 million was false and misleading because the spreadsheet providing the model for the $250 million valuation provided no basis for that calculation and simply assumed that the value was $250 million without providing any objective support. *See* Counterclaim ¶ 76.

*Sixth*, AFG alleges that the Investor Presentation included a representation that BEN had "currently available Multi-modal conversational AI & AI Avatars: Fully Customizable 'Human-like' AI & AI Avatars." AFG contends that this representation was false or misleading because BEN's technology was, in reality, non-existent and non-functioning.

At the pleading stage, AFG's allegations in support of these six alleged misrepresentations are sufficient, even under Rule 9(b)'s heightened pleading standard.

The Individual Counterclaim-Defendants argue that AFG has not sufficiently alleged which of the Individual Counterclaim-Defendants made the alleged misrepresentations in the July 17, 2023 slide deck and the Investor Presentation. The Court disagrees. At this juncture, AFG's allegations are sufficient to put the Individual Counterclaim-Defendants on notice of the counterclaims against them. *See supra* Section I(b). Dismissal on this ground prior to discovery would therefore be improper.

Furthermore, despite Counterclaim-Defendants' assertion to the contrary, AFG has sufficiently alleged that these representations are material because there is a substantial likelihood that a reasonable investor would consider this information important in deciding to invest. *See Texas Cap. Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App. 2001)). To the extent Counterclaim-Defendants argue that the representation that BEN had a pre-money equity value of $250 million reflects an opinion, the Court disagrees for the reasons set forth in Section I(b). AFG's allegations are sufficient at the pleading stage; whether this representation was one of fact or opinion is best decided by the trier of fact.

With respect to the remaining alleged misrepresentations, however, AFG fails to plead with the requisite particularity why or how these representations were false or misleading.

AFG's claims regarding the Registration Statement are demonstrative.[9] AFG alleges that the Registration Statement contained untrue statements of material fact and materially misleading omissions regarding the due diligence DHC and Gaertner had performed on BEN's intellectual property. Counterclaim ¶ 106. Specifically, AFG alleges, the Registration Statement declared that Gaertner and DHC "conducted detailed intellectual property . . . diligence of BEN" and that "between April 25 and September 7, 2023, DHC conducted . . . intellectual property due diligence review of BEN." Counterclaim ¶ 66. AFG alleges that these statements are materially untrue or misleading because had Gaertner and DHC conducted what a reasonable investor would have understood to be detailed due diligence of BEN's portfolio of IP, "they would have surely learned what the market and AFG discovered too late: that BEN's intellectual property was basically worthless." Counterclaim ¶ 67. This conclusory allegation comes nowhere close to meeting Rule 9(b)'s particularity standard. AFG cannot rest on its say-so that these statements are fraudulent; it must explain why. *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004). AFG has not done so. A representation simply stating that "detailed due diligence on BEN's intellectual property was conducted" is not made false or misleading just because a reasonable investor would have, in AFG's view, found BEN's intellectual property to be "virtually worthless." As far as the Court can discern, nowhere does the Registration Statement promise that BEN's intellectual property has any worth to investors like AFG. To the contrary, it expressly provides that "There are a number of risks associated with [BEN's] patent rights and other intellectual property rights, including whether

---

[9] For the avoidance of doubt, the Court has considered each of AFG's alleged misrepresentations and concludes that they are likewise inactionable.

such rights are valid, enforceable or sufficient to protect [the company's] business, products or services." Registration Statement at 186.

AFG also alleges that the Registration Statement misleadingly stated that DHC received "multiple live demonstrations of BEN's artificial intelligence product offerings indicating their readiness and potential for commercial viability." Counterclaim ¶ 69. According to AFG, "On information and belief, given BEN's inability to deliver a remotely workable product to AFG, any demonstrations that DHC and Gaertner received could not possibly have indicated the readiness and potential for commercial viability of BEN's supposed 'product offerings,' rendering this statement false or misleading." Counterclaim ¶ 69. Nor could Gaertner, in AFG's view, have reasonably been convinced from any "live demonstrations" he received of the "readiness and potential for commercial viability" of BEN's supposed "product offerings" given his experience in technology banking and that he "has likely attended many product demos in his career." *Id*. These allegations smack of conclusoriness. Allegations of fraud based on "information and belief" are sufficient under Rule 9(b) only if they are based on matters "peculiarly within the opposing party's knowledge" and are "accompanied by a statement of facts upon which the belief is founded." *Lichtenstein v. Reassure Am. Life Ins. Co.*, 2009 WL 792080, at *7 (E.D.N.Y. Mar. 23, 2009); *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir. 1986). AFG has not alleged that such matters are peculiarly within the knowledge of Gaertner and DHC, and its allegations are bereft of any facts in support of its bald assertion that "any demonstration that DHC and Gaertner received could not possibly have indicated the readiness and potential for commercial viability of BEN's supposed 'product offerings.'" Counterclaim ¶ 69. That Gaertner has "likely" attended many product demos in his career is wholly insufficient to meet Rule 9(b)'s pleading requirements.

40

In sum, AFG has stated a claim against Prior BEN and Lucas for the three representations in the July 17, 2023 slide deck, the representation in the patent spreadsheet attached to the June 21, 2023 email, and the representations in the Investor Presentation concerning BEN's AI technology and pre-money equity value. The fact that a claim is stated against Prior BEN, which is not a party to this action, is relevant only to the issue of secondary liability; Lucas is the only defendant of record as to whom AFG has stated a viable theory of misrepresentation under the TSA. As none of the actionable statements were made either by BEN or Gaertner, AFG has failed to state a primary violation against these two Counterclaim-Defendants.

None of AFG's remaining alleged misrepresentations are actionable.

### b. COUNTS 4 AND 5: SECONDARY LIABILITY

In addition to primary liability, the TSA allows for a finding of secondary liability for security violations. Secondary liability can attach to a control person, defined as "a person who directly or indirectly controls a seller, buyer, or issuer of a security," or an aider, defined as "A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." Tex. Gov't Code §§ 4008.055(a), (c). Both control persons and aiders are jointly and severally liable with the primary violator to the same extent as if they were the primary violator.

AFG asserts secondary counterclaims against Lucas, Chang, and Gaertner for controlling personal liability pursuant to Section 4008.055(a) of the TSA, and against Lucas, Nunally, Chang, and Gaertner for aider liability under Section 4008.055(c).

Counterclaim-Defendants move to dismiss AFG's secondary liability counterclaims only on the ground that AFG has failed to plead a primary violation under the TSA. It is true that there must first be a primary violation before a party can be held secondarily liable. *See Sterling Tr. Co.*

41

*v. Adderley*, 168 S.W.3d 835, 845 (Tex. 2005). Because the Court has held that AFG has plausibly alleged a primary violation, however, AFG's control person and aider and abettor counterclaims cannot be dismissed at this juncture.

## IV.   **LEAVE TO AMEND**

AFG's reply brief contains a footnote requesting leave to amend should the Court find its allegations lacking. Dkt. No. 50 at 29 n.16.

"[L]eave [to amend] shall be freely given where justice so requires." Fed. R. Civ. P. 15(a). The case remains at an early stage; discovery has not yet commenced. AFG has not been dilatory in seeking leave to amend, and Counterclaim-Defendants do not claim that they would be unduly prejudiced from the filing of amended counterclaims.

Nevertheless, AFG's "motion" for leave to amend does not comply with the requirements set forth in Local Rule 15.1.[10] While failure to comply with Local Rule 15.1 is not itself fatal nor dispositive where no undue prejudice would result, a plaintiff must "at least provide some factual detail or evidence as to the proposed amendment." *Cooper v. Trs. of Coll. of Holy Cross*, 2014 WL 2738545, at *10 (S.D.N.Y. June 17, 2014). This is necessary "so that both the Court and opposing parties can understand the exact changes sought." *Zito v. Leasecomm Corp.*, 2004 WL 2211650, at *25 (S.D.N.Y. Sept. 30, 2004) (citation omitted). Denial of leave to amend is therefore proper where a plaintiff seeks leave to amend "only in the final sentence of [its] opposition to the motion to dismiss" and fails to offer any new factual allegations it would make if granted leave to amend.

---

[10] Local Rule 15.1(a) requires that a motion to amend must "include as an exhibit (1) a clean copy of the proposed amended or supplemental pleading; and (2) a version of the proposed pleading that shows—through redlining, underlining, strikeouts, or other similar typographic method—all differences from the pleading that it is intended to amend or supplement."

*Metz v. U.S. Life Ins. Co. in City of New York*, 662 F.3d 600, 603 (2d Cir. 2011); *Powell v. Ocwen Loan Servicing. LLC*, 840 F. App'x 610, 613–14 (2d Cir. 2020).

AFG has provided no indication of how repleading would address the issues raised in Counterclaim-Defendants' motions to dismiss. Because AFG has provided no insight as to the nature of its proposed amendments, granting it the opportunity to amend its pleadings would be premature. *See Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y. 1993).

AFG's motion for leave to amend is therefore DENIED without prejudice to refiling a proper motion, accompanied by its proposed amended pleadings and a statement explaining how the amendments would address the deficiencies outlined above, within thirty days of this Order.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully requested to remove the motions at Dkt. Nos. 38 and 41 from the Court's list of open motions. This is a written opinion. This constitutes the decision and order of the Court.

43

Dated: March 9, 2026

_____
U.S.D.J.

BY ECF TO ALL COUNSEL